King Oil Company v. Commissioner.
King Oil Co. v. Commissioner
Docket No. 1714.
United States Tax Court
1944 Tax Ct. Memo LEXIS 106; 3 T.C.M. (CCH) 1006; T.C.M. (RIA) 44314; September 27, 1944
*106 Harry C. Weeks, Esq., Sinclair Bldg., Fort Worth, Tex., for the petitioner. Frank B. Appleman, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion This is a proceeding to redetermine deficiencies in income and excess profits taxes for the calendar year 1939, in the amounts of $9,693.29 and $3,428.09, respectively. Certain concessions have been made by both parties and will be given effect in the recomputation under Rule 50. Only one issue remains, namely, whether petitioner can deduct from its 1939 income "intangible drilling and development costs," the amount of which is not in dispute, incurred in the drilling of certain oil wells on leased properties. Findings of Fact Petitioner, the King Oil Company, is a Delaware corporation with its principal office in Wichita Falls, Texas. It is engaged primarily in the business of developing oil properties and producing oil. Its return for the period here involved was filed with the Collector of Internal Revenue for the second collection district of Texas. Petitioner had previously exercised the option where it was available under proper circumstances to charge to expense so-called "intangible drilling and development *107 costs" incurred in the drilling of oil wells. In its return for 1939 deductions for intangible drilling and development costs in connection with the following wells and leases were claimed as set forth below: Claimed
Name of Lease
Well No.
Deductions
Waggoner "N"
9
$ 3,977.08
Crudup
6
6,882.29
Waggoner "R"
7 and 8
4,497.05
King-Waggoner
3
5,895.79
Rathke
3
3,612.96
Wigley
4, 5, 6 and 7
46,734.03
J. & J. Waggoner
1
12,484.28
WAGGONER "N" WELL NO. 9 The Waggoner "N" lease comprises a 320 acre tract in Wilbarger County, Texas, which had been leased to petitioner on December 9, 1935, by W. T. Waggoner Estate. The lease contained the usual royalty provision and read in part as follows: "That the Lessor in consideration of the sum of One Dollar, cash in hand paid by the Lessee, the receipt of which is hereby acknowledged and the covenants and agreements hereinafter set out, to be kept and performed by the Lessee have granted, demised, leased and let and by these presents do grant, demise, lease and let unto the Lessee for the sole and only purpose of drilling and mining (but not manufacturing) for gas and oil or either of them, the following lands *108 in Dilbarger County, Texas, to-wit: * * * * *
"As a part of the consideration hereof the Lessee covenants and agrees and binds himself to begin actual drilling of a well on said premises within 30 days from date hereof, and to prosecute the drilling thereof with due diligence to a depth of 2400 feet, unless oil or gas is found and produced and saved at a lesser depth "If no well be begun hereon, as above provided, or if a well is begun and the drilling is not prosecuted with due diligence, as herein provided, or if said well should be abandoned, (failure to drill for as much as 30 days at any one time, shall be an abandonment) then this lease shall immediately become null, void and of no effect and shall automatically revert to the Lessor herein without the action of any court "Provided, however, in case a well is abandoned, and the next well shall be drilling within 20 days from abandonment of the former well, the Lessee shall have 60 days from the completion of one well in which to begin the actual drilling of another well, such well to be prosecuted with due diligence and to be under the same conditions, requirements and limitations as the first well mentioned herein. And *109 the Lessee shall and will continue to dig additional wells on said tract, each succeeding well to be begun within 60 days from the completion of the preceding well, and to be drilled under the same conditions, requirements and limitations as provided for the first well, until the Lessee shall have dug a well on each twenty acres herein, the well for a center. Only producing wells shall hold twenty acres in a square form, the well for a center, for the time herein specified." Prior to 1939 petitioner had drilled eight wells on this lease, six of which were producers. The ninth well, the one here in question, was begun on February 22, 1939, and completed as a producer April 5, 1939. At the time well No. 9 was begun there were four producing wells within the limits of the N.E. one-fourth, containing 80 acres of the leased tract. Well No. 9 was located in this N.E. one-fourth. Twenty acres in square form with well No. 9 as the center cover acreage not included in any other square 20 acre tract having any other well as the center thereof. Petitioner expended $3,977.08 for intangible drilling and development costs in the drilling of well No. 9. GRUDUP WELL NO. 6 Prior to August 1, *110 1938, H. L. Graham and others owned oil and gas leases on a 31.5 acre tract and a 40 acre tract in Wichita County, Texas, under a lease executed on March 31, 1938, by R. L. Crudup and his wife. On August 1, 1938, petitioner became the owner by assignment of a one-half interest in these two leases. The instrument of transfer, after reciting the execution of the original leases reads in part as follows: "In the event King Oil Company does not elect to drill a well upon one of the above described tracts of land on or before February 15, 1939, then this title hereby assigned shall terminate and reinvest in H. L. Graham and said partnership Star Drilling Company. "If such well is drilled, King Oil Company, its successors and assigns, shall pay the cost of such well and if a producer, shall pay the cost of equipping the same into the tanks, the assignors herein contributing to such joint enterprise the leases above described. The well contemplated hereby if begun shall be drilled to a depth of 2700 feet unless completed as a commercial producer at a lesser depth. "In the event said property producer oil and/or gas in paying quantities, King Oil Company, its successors and assigns, shall *111 have the right to operate the same, and the provisions, operator's lien and stipulations contained in the contract between the parties hereto recorded in Vol. 358, page 115 of the Deed Records of Wichita County, Texas, are here adopted by reference as applying to this property." In drilling the required well on the Grudup lease, the intangible drilling and development costs incurred by petitioner in 1939 amounted to $6,882.29. WAGGONER "R" WELLS 7 AND 8 On November 3, 1936, the W. T. Waggoner Estate made an oil and gas lease to petitioner on 80 acres of land in Wichita County, Texas. The lease instrument in form is identical with the Waggoner "N" lease instrument above set forth. In 1939 wells 7 and 8 were drilled on this tract by petitioner. Prior to that year petitioner had drilled five producing wells and one dry well on this tract. Twenty acres in square form with well No. 5 as the center would include the location of wells 7 and 8. Twenty acres in square form with well No. 7 as the center and twenty acres in square form with well No. 8 as the center cover acreage not included in any other like 20 acre tract with any other well as the center thereof. In 1939 petitioner *112 expended as intangible drilling and development costs the amount of $4,497.05 in the drilling of these two wells. KING-WAGGONER WELL NO. 3 On October 14, 1937, the W. T. Waggoner Estate made an oil and gas lease to Edwin S. Smith, Jr., on 320 acres of land in Wilbarger County, Texas. The tract covered by the lease was 3520 feet by 3960 feet. The oil and gas lease is incorporated herein by reference. In form it was identical to the above set forth Waggoner "N" lease. On October 18, 1937, Edwin S. Smith, Jr., assigned his oil and gas lease to petitioner, reserving an overriding 1/32nd royalty. The instrument contained the following provisions: "I [assignor] further agree, in connection with such reserved interest, that the fact of such reservation shall not operate in any manner to increase the obligation of King Oil Company, its successors or assigns to develop or carry on operations on said leased premises, or any part thereof and only such obligations for the development of such premises as are a part of or incident to such original lease shall exist, hereby waiving in favor of said King Oil Company the right in good faith to determine, insofar as such reserved interest *113 is concerned, the measure of diligence for all such operation and development." Petitioner drilled well No. 3 of this tract in 1939 and expended for intangible drilling and development costs the amount of $5,895.79. Prior to drilling this well petitioner had drilled two producing wells on the King-Waggoner tract. Well No. 3 was drilled in a location not included in a square 20 acre tract with either wells No. 1 or No. 2 as the center thereof. A square 20 acre tract with well No. 3 as the center includes land not included in any other 20 acre square with any of the other wells as the center thereof. RATHKE WELL NO. 3 On July 30, 1938, Rathke Oil Company executed an oil and gas lease to petitioner and others covering 40 acres of land in Wichita County, Texas. This oil and gas lease was for a primary term of one year and as long thereafter as oil and gas or either of them should be produced by the lessees. The lease contained the usual royalty provision, no provisions for delay rentals, and further provided as follows: "Witnesseth: That the said lessor, for and in consideration of Ten and no/100 dollars, cash in hand paid receipt of which is hereby acknowledged, and of the covenants *114 and agreements hereinafter contained on the part of the lessee to be paid, kept and performed has granted demised, leased and let and by these presents does grant, lease and let into the said lessee for the sole and only purpose of mining and operating for oil and gas * * * all that certain tract of land situated in the county of Wichita State of Texas, described as follows, * * *. * * * * *
"This lease is subject to all of the terms and provisions of a written contract contemporaneously executed by the parties." The contract referred to in the quoted portion was between Rathke Oil Company as lessor, petitioner, H. L. Graham, and R. B. Melat, doing business as partners under the name Starr Drilling Company, H. L. Graham, individually, and Rathke Oil Company, as lessees. The contract recited in part as follows: "1. The parties have agreed that locations shall be made for four wells upon said tract of land, the first location being in the east corner offsetting the well on the Jackson land immediately south, the second location near the approximate center of said tract of land, the third location in the southwest corner of said tract of land, and the fourth location in the northwest *115 corner. To each of such locations shall be attributed 10 acres of said land as follows: * * * * *
"2. As quickly as possible after the execution of this agreement, Lessees agree to begin the drilling of a well at said No. 1 location (as soon as permit therefor can be obtained) and prosecute such drilling with due diligence to a depth of 2700 feet, unless such well is completed as a commercial producer of oil and/or gas at a lesser depth. However, such well shall not be completed at a depth shallower than the Canyon sand until it has tested the Canyon sand. If it fails to make a commercial producer of oil in the Canyon sand, then such well may be completed as a commercial producer at any shallower depth. "3. After the completion of such first well Lessees shall begin at one of the locations above mentioned a second well, and at the completion of each such well shall continue until four such wells at the locations above specified have been drilled and completed in the manner as provided for the first well. However, should conditions in the oil industry fail to improve to the extent that connections for new wells can be obtained, or should the price of oil decrease, or from such *116 conditions it would appear imprudent as oil operators to carry out such intended program, then such drilling program shall be delayed pending the improvement in such conditions and such delay so caused shall not be counted against lessees. Likewise, if wells drilled on such property, or in its vicinity, indicate that any such location could not be profitably drilled, lessees shall have the right to refuse to drill any such well by surrendering to lessor the lease above described as to such location and the acreage attributable to such location as above set out. * * * * *
"In connection with paragraph numbered 3 above, and in clarification thereof, it is expressly agreed (anything to the contrary notwithstanding): "a - That such wells shall be drilled within twelve months from this date, unless lessor extends the time in writing. "b - That it is not intended to grant to lessees any option with respect to the drilling of said four wells and all four and such wells shall be drilled unless it appears a well drilled at any such location would result either in a dry hole or in such a light well as that it could not eventually pay out." Petitioner expended as its share of the intangible *117 drilling and development costs on well No. 3 of this tract the sum of $3,612.96 in the year 1939. On June 3, 1937, S. W. Wigley, acting individually and as community administrator of the community estate of himself and his deceased wife, made an oil and gas lease to petitioner of 160 acres of land in Wichita County, Texas, for a cash consideration of $2,400 which was duly paid by petitioner. This oil and gas lease incorporated herein by reference was for a primary term of five years and as long thereafter as oil or gas might be produced. It contained the usual provisions as to royalty, and provides that if no well be commenced before June 3, 1938, the lease would terminate unless the lessee paid a delay rental of $160, and that, in like manner, the beginning of a well could be deferred for successive one-year periods throughout the primary term of the lease by the payment of the delay rental. The lease contained the usual provisions of warranty and of assignment and provided for payment of a proportionate part of the royalties and rentals in the event the lesser owned a less interest than the undivided fee simple estate. The first well drilled by petitioner on the Wigley lease *118 was begun on December 12, 1937, and completed January 28, 1938, at a depth of 3845 feet. It produced from 300 to 400 barrels of oil per day. At that time all tracts contiguous to the Wigley tract were undergoing extensive development. After the completion of the first well and in consequence of dissatisfaction on the part of the Wigley daughters with the development of the tract, a new instrument was executed on March 3, 1938, by S. W. Wigley and five daughters and their husbands and by petitioner, purporting to modify the terms of the original lease. This instrument, after reciting the execution of the original lease, read in part as follows: "WHEREAS, certain questions have been raised with respect to the validity of said lease above described, and it is the desire of all parties to remove all such questions in the interests that said lease may be properly and adequately developed and that therefrom there may result benefits to all parties flowing from such development and the settlement of all such questions; therefore, "KNOW ALL MEN BY THESE PRESENTS: That we * * * That we * * * [S. W. Wigley and the five daughters joined by their husbands] * * * for valuable consideration to *119 use in hand paid by King Oil Company, receipt whereof is hereby acknowledged, and the further consideration of the agreements hereinafter contained on the part of King Oil Company to be kept and performed have Granted, Demised, Leased and let the 160 acres described in said lease of record in Vol. 345 at page 337 of said Deed Records in strict accordance with all of the terms and provisions of said original lease as modified by this agreement. "TO HAVE AND TO HOLD, said land unto the said King Oil Company, according to the terms of said original lease as modified by this agreement, and we each jointly and severally bind ourselves, our heirs, executors and administrators to Warrant and Forever defend title to said property and to save harmless King Oil Company, its successors and assigns, from any defect in title thereto, so that from and after the delivery of this instrument no attack upon the validity of the lease hereby expressed, shall be made except upon failure of King Oil Company to observe the provisions of this instrument. "In consideration of the premises, King Oil Company agrees that it will seasonably begin and with due diligence prosecute the drilling of additional wells *120 upon said 160 acres of land so that within two years from this date it will have drilled six additional wells on said 160 acres of land unless in the course of such drilling program a dry hole is completed to the present producing horizon. If such dry hole is drilled then the said King Oil Company, shall be relieved of further drilling thereafter until an additional well is necessary to offset a commercially producing well on adjacent land. It is contemplated that the wells so to-drilled [drill] shall be drilled three on or before the expiration of the first year and the remaining three on of before the expiration of the second year. However, this agreement shall not relieve King Oil Company, its successors and assigns, from the obligation to use due diligence in offsetting wells on adjacent land within a reasonable time." In connection with the execution of this instrument petitioner paid each of the daughters $320. Nothing was paid to S. W. Wigley. He never complained about the lease or made any threat about the title. In 1939, petitioner drilled wells No. 4, 5, 6 and 7 on the Wigley tract and expended in cash $46,734.03 as intangible drilling and development costs. J. & J. *121 WAGGONER WELL NO. 1 On November 19, 1937, T. J. Waggoner and J. L. Waggoner made an oil and gas lease to petitioner on 244.35 acres of land. This oil and gas lease incorporated herein by reference was for a primary term of three years and contained the usual provisions as to royalties and for delay rentals, except that, in addition to ordinary royalties, the lessors reserved an overriding royalty until they had received $18,326. The lease provided further as follows: "WITNESSETH: That for valuable consideration to lessor, in hand paid by Lessee, receipt whereof is hereby acknowledged and of the covenants and agreements hereinafter contained on the part of lessee to be paid kept and performed, and subject to the conditions and reservations hereinafter set out, have granted, demised, leased and let and by these presents do grant, lease, and let unto the said lessee, for the sole and only purpose of mining and operating for oil and gas and of laying pipe lines and of building tanks, powers, stations and structures thereon to produce save and take care of said products, all that certain tract of land situated in the county of Wichita, State of Texas, described as follows, to-wit; *122 * * * * *
"IT IS AGREED, that this lease shall remain in force for a term of three years from this date. If at the end of such three year period the lessee is then engaged in drilling a well on said premises, this lease shall continue in force as to all of said land so long as such drilling continues, and such drilling shall be considered as being continuous so long as no more than six months elapses between the completion of one well, either as a commercial producer or a dry hole, and the commencement of a subsequent well. Whenever twelve wells have been drilled on said leased premises, no further obligation for drilling on said premises shall be required except to protect the same from offset drainage on lands owned by persons other than lessors, However, if drilling operations have ceased, or when drilling operations cease after the expiration of such three years primary term and if twelve wells have not theretofore been drilled either as producers or as dry holes, then this lease shall continue in full force and effect as to all wells then producing oil and/or gas so long as any such wells so produced, but only as to 20 acres for each such well so drilled such 20 acres for each *123 well to be selected and designated by the lessee so as to include all of said wells. The lease, however, shall terminate at the end of three years or upon the cessation of drilling operations thereafter prior to the completion of twelve wells, as to all of said land except 20 acres for each such well to be designated by the lessee in the manner above set out." On February 12, 1939, after paying the delay rentals due up to that time, petitioner, began its No. 1 well on this property and completed the same on March 18, 1939, expending in cash $12,484.28 as intangible drilling and development costs. The respondent disallowed the deduction of the amounts claimed by petitioner as intangible drilling and development costs on the ground that such costs represented capital expenditures and not deductible expenses. On January 24, 1944, petitioner paid to the Collector of Internal Revenue at Dallas, Texas, $15,811.09 to be applied against its income and excess profits tax liability and interest thereon. Opinion ARUNDELL, Judge: The question for decision is whether or not q petitioner is entitled to deduct from income in the year $ 1939, "intangible drilling and development cost" incurred *124 in the $ drilling of the various oil wells set forth in our findings of fact. $ Petitioner contends that the amounts in question are deductible under the provisions of Regulations 103, section 19.23(m)-16. [1] Since the option had previously been exercised in favor of expensing such charges, petitioner must be sustained if the expenditures were of the sort comprehended by the regulations. Respondent contends that the drilling of each of the wells under the leases here involved was part of the consideration for the acquisition of rights under the leases and the cost thereof must be capitalized. *125 Each of the seven leases, together with the modifying contract in the case of the Wigley lease, expressly places upon petitioner the obligation to drill in a manner set forth in the instrument and provides that title to the property shall revest in the lessor in case of failure to do so. In the case of the three Waggoner Estate leases, "as part of the consideration", petitioner bound itself to begin drilling and to continue to drill according to a specified program until there should be a producing well for each 20 acres, a well [for] the center, with no more than 60 days intervening between the completion of one well and the beginning of the next. Only land appurtenant to a 20 acre tract, with a producing well for a center, was to be retained by the lessee. The Crudup lease, in effect, gave petitioner an option to drill, with a limitation that if no well was drilled on or before a certain date; the lease should terminate. The Rathke lease was in consideration of the covenants and agreements of petitioner, one of which was the express obligation of petitioner to drill four wells within 12 months without option, unless any one of the four locations could not be profitably drilled, *126 whereupon petitioner was to surrender the lease as to such location. In consideration of the Wigley lease, as modified by the agreement of March 3, 1938, petitioner unqualifiedly agreed to drill three wells a year for two years, unless a dry hole should be encountered. Under the J. & J. Waggoner lease, petitioner, in consideration of the lease, agreed to drill 12 wells, the lease to terminate at the end of three years or upon the cessation of drilling operations thereafter prior to the completion of the 12 wells, except as to 20 acres for each well competed at such time. The question thus presented is stated in Hardesty v. Commissioner, 127 Fed. (2d) 843, affirming 43 B.T.A. 245, as follows: The ultimate question for decision, therefore, is whether or not the oil wells drilled in this case were drilled as consideration for the assignment of the undivided interests in the oil properties; for if they were drilled as consideration for the assignment, the drilling and development costs are not deductible under the regulation but must be treated as a capital expenditure. * * * The same test has been applied in Hunt v. Commissioner, 135 Fed. (2d) 697, *127 affirming and modifying Hassie Hunt, B.T.A. Memo. Opinion 8/18/42; Stansylvania Oil and Gas Co. v. Commissioner, 135 Fed. (2d) 743, affirming per curiam Stansylvania Oil and Gas Co., B.T.A. Memo. Opion 8/18/42; Walsh v. Commissioner, 135 Fed. (2d) 701, affirming Mary D. Flemming Walsh, B.T.A. Memo. Opinion 6/17/42, and * F.H.E. Oil Co., 3 T.C. 13, appealed to the Circuit Court of Appeals for the 5th Circuit, 8/12/44, [2] by the taxpayer. Our only task, therefore, is the application of a rule now settled to the facts of the particular case. It is apparent, we think, that each of the wells involved herein was drilled as part of the consideration for the assignment of the interests in the oil properties. In some of the leases the drilling was expressly stated to be part of the consideration. Hardesty v. Commissioner, supra. *128 In others the drilling was necessary to avoid termination of the lease in part or in whole. F.H.E. Oil Company, supra. On the authority of the decided cases, we hold that the intangible drilling and development costs were a part of the cost of the leases, and must be capitalized. As to the Wigley lease, petitioner argues alternatively that at least one-half of the intangible drilling and development costs should be allowed as a deduction on the theory of apportionment advanced in Hunt v. Commissioner, supra. That case held in part that where the taxpayer had acquired one-half of the tract in consideration of the drilling of a well and one-half without drilling consideration, one-half of the intangible expenses of a well drilled in development of the entire tract should be treated as consideration and capitalized and the balance allowed as a deduction under the option of the regulation. Petitioner's argument runs something as follows: S. W. Wigley, the father, who had an undivided one-half interest in the land, never complained about the development of the lease; only the daughters, owning together the remaining one-half, *129 were dissatisfied; therefore, the modification agreement of March 3, 1938, imposing upon petitioner as consideration of the ratification of the lease the obligation to drill, was effective only with respect to the one-half belonging to the daughters and, therefore, that portion of the expenses attributable to the development of the S. W. Wigley undivided one-half interest did not constitute consideration and is deductible. This argument is completely without foundation, for the reason that Wigley was a party to the ratification agreement in which the petitioner undertook the obligation to drill as consideration, and the obligation runs equally to him. There is, thus, no basis for an apportionment such as was made in the Hunt case. We hold, therefore, that the amount of $84,083.48 expended as intangible drilling and development costs should be capitalized and recovered through allowances for depletion and that the Commissioner was correct in disallowing the deduction of that amount. Decision will be entered under Rule 50. Footnotes
1. Regulations 103, Sec. 19.23(m)-16. Charges to capital and to expense in the case of oil and gas wells. - (a) Items chargeable to capital or to expense at taxpayer's option: (1) Option with respect to intangible drilling and development costs in general: All expenditures for wages, fuel, repairs, hauling, supplies, etc., incident to and necessary for the drilling of wells and the preparation of wells for the production of oil or gas, may, at the option of the taxpayer, be deducted from gross income as an expense or charged to capital account. Such expenditures have for convenience been termed intangible drilling and development costs. * * *↩
2. Tax Court decision aff'd, 147 Fed. (2d) 1002, rehearing denied, 149 Fed. (2d) 238, second motion for rehearing denied, 150 Fed. (2d) 857↩.